## UNITED STATES *v.* MARTIN.

*(District Court, D. Oregon.  June 27, 1883.)*

1. OFFICER OF THE UNITED STATES.
   A deputy marshal is an officer of the United States, within the purview of section 5398 of the Revised Statutes, and so is the keeper of a state jail to whose custody a person is committed by legal process issued by a United States court or judicial officer, with the consent of the state.

2. COMMISSIONER OF THE CIRCUIT COURT.
   A commissioner of the circuit court, when engaged under section 1014 of the Revised Statutes in causing the arrest or imprisonment, or holding to bail for trial, any person charged with the commission of a crime against the United States, acts as a committing magistrate, and must proceed according to the law of the state in similar cases.

3. ORDER TO BRING PRISONER INTO COURT.
   Section 1030 of the Revised Statutes does not apply to proceedings before such commissioners acting under the authority of said section 1014; and it is doubtful if a jailer having a prisoner in custody for trial in the circuit or district court is obliged to bring or send him into court, or deliver him to the marshal for that purpose, without a written order to that effect.

4. LEGAL PROCESS UNDER SECTION 5398.
   Under the Oregon Code of Criminal Procedure, §§ 402, 403, and at common law, it is sufficient in a commitment to designate the crime involved in killing a human being with malice aforethought, generally, as "murder;" and therefore, a commitment issued by a commissioner of the circuit court, in and for said state, directed to the keeper of a county or town jail therein, and requiring him to receive and safely keep a person therein named, and charged upon the oath of another with the crime of "murder," until discharged by due course of law, is legal process, within the meaning of that term as used in the latter clause of said section 5398; and resistance to the execution thereof, as by taking such person out of such jail or the custody of such jailer without his consent, is a violation of such section.

Information for the Violation of section 5398, Rev. St.

*James F. Watson,* for the United States.

*W. Lair Hill* and *W. J. Thompson,* for defendants.

DEADY, J. On January 9, 1883, the district attorney, by leave of the court, filed an information herein, charging the defendant with a violation of section 5398 of the Revised Statutes, which provides that—

"Every person who knowingly and willfully obstructs, resists, or opposes any officer of the United States in serving, or attempting to serve or execute, any mesne process or warrant, or any rule or order of any court of the United States, or any other legal or judicial writ or process, * * * shall be imprisoned not more than twelve months and fined not less than $300."

The information contains two counts, and states that Ah Hote, Weet Soot, Capsula, and Petenus, Indians belonging to the Umatilla Indian reservation, being charged, before a commissioner of this court, with the crime of murder, committed in the killing of one Charles Mulheren, were by said commissioner committed to custody pending their examination upon said charge,—the first-named two, to the custody of the keeper of the town jail of Pendleton, Oregon, and the last two to the custody of the defendant, as keeper of the county jail of Umatilla county, Oregon; that the defendant afterwards knowingly and willfully took and rescued said Ah Hote and Weet Soot from the custody of the keeper of said town jail, and also refused to deliver said Petenus and Capsula to the United States marshal, although demanded by the latter, upon the order of said commissioner, to bring them before him for further examination upon said charge, and with force and violence prevented said marshal from executing said order. The defendant demurred to the information on the ground that this court had no jurisdiction of the crime charged against the Indians. On February 5, 1883, the court overruled the demurrer. 14 FED. REP. 817. Thereupon the defendant surrendered the Indians to the marshal, and they were indicted by a grand jury of this court for the murder of Mulheren. An Indian of the same reservation, named Tummusk, was included in the indictment, and subsequently found and arrested by the marshal. Upon the trial, all of them, except Weet Soot, who was discharged from the indictment and allowed to become a witness for the government, were found guilty of manslaughter, and on May 22, 1883, sentenced to 10 years' imprisonment each in the penitentiary of Oregon. On February 16, 1883, this cause was submitted to the court for judgment upon a stipulation to the effect that a statement of facts then filed in the court should be taken and considered to be the special verdict of a jury in the case, subject, however, to objection for immateriality to all or any portion of such statement. From this special verdict it substantially appears as follows:

(1) That said four Indians all belong to said Indian reservation, and are under the charge of an Indian agent.

(2) That said Charles Mulheren was a white man, and was killed by said Indians on said reservation on November 22, 1882.

(3) That the defendant is, and at and during all the times herein mentioned was, the sheriff of said Umatilla county and the keeper of the jail thereof; that Mr. Fred. Page Tustin is, and at and during said times was, a duly-appointed commissioner of this court, with authority to examine, commit for trial, and admit to bail "all persons committing offenses against the laws of the United States" in the district of Oregon; that S. L. Morse is, and at and during said times was, a duly-appointed and acting deputy marshal of the United States for said district; and that P. M. McDonald is, and at and during said times was, the keeper of the town jail in said town of Pendleton.

(4) That said commissioner, on November 28, 1882, on a complaint duly verified by the oath of said McDonald on said date, charging Weet Soot with the crime of murder in killing said Charles Mulheren on November 22, 1882, in the county of Umatilla and district of Oregon, and on said Indian reservation, issued a warrant for the arrest of said Weet Soot on said charge, upon which he was arrested by said Morse on November 29, 1882, and brought before said commissioner for examination on December 8th; that afterwards Ah Hote, Petenus, and Capsula were arrested by said Morse on similar warrants issued by said commissioner for their respective arrests on similar complaints, verified by the oath of said McDonald, the complaints and warrants in the cases of Ah Hote and Petenus being each dated December the 4th, and in the case of Capsula on December 16th; that Ah Hote was arrested on December 7th, and brought before the commissioner for examination on December 8th; and that, thereupon, said Weet Soot and Ah Hote were each committed to the custody of the keeper of the town jail aforesaid on a *mittimus* issued by said commissioner, from which it appeared that the prisoners had been charged on oath with the crime of murder committed in Umatilla county, Oregon, on November 22, 1882, and examined by said commissioner on said charge, and required "to render himself in appearance before him," and that said keeper was commanded in the name of the president of the United States to receive the said Ah Hote and Weet Soot, as prisoners of the United States, into his custody in said town jail, "there to remain until discharged by due course of law;" that said Petenus and Capsula were arrested on December 16th, and brought before said commissioner on the same day for examination, and were thereupon each committed to the custody of the defendant, as keeper of the county jail aforesaid, upon a *mittimus* issued by the commissioner, similar to those issued to the keeper of the town jail in the cases of Ah Hote and Weet Soot.

(5) That Ah Hote and Weet Soot remained in the custody of the keeper of said town jail, under said commitments, until December 18, 1882, when the defendant took them from said custody and jail without the consent of said keeper, upon a warrant from the circuit court of the state for said county, directed to him as sheriff thereof, and commanding him to arrest all of said Indians as defendants in an indictment found by the grand jury of said court on said day, charging them with the crime of murder, in killing said Mulheren.

(6) That on said December 18th said commissioner made a verbal order directing said Morse to bring all of said Indians before him for further examination upon the charge aforesaid, which order he then and there attempted to execute, and for that purpose demanded each of said Indians from the defendant, who then had them all in his custody in said county jail, and knew that said Morse was then acting as deputy United States marshal, and made such demand as such deputy, and in pursuance of said order of the commissioner; but the defendant refused to deliver any of said Indians to said deputy, or to permit him to take any of them from said county jail, giving as a reason therefor the finding of the indictment in the state court, and the issuing of the warrant to him thereon, as aforesaid.

(7) That the defendant acted in good faith in the premises, believing it to be his duty as sheriff to take and detain said Indians.

The defendant contends that judgment cannot be given against him on this verdict for a violation of said section 5398 of the Revised Statutes, because it does not appear therefrom that he obstructed or resisted an officer of the United States in the execution or attempt to execute a legal order or process of the United States, or any court thereof, in that it does not appear from the facts found that it was stated or alleged, in any of the proceedings before the commissioner for the arrest, examination, or commitment of said Indians, that Mulheren was a white man, and therefore it does not appear that the commissioner had jurisdiction to issue a warrant for the arrest of said Indians for the killing of said Mulheren, or to make any order concerning the same.

There is no question but that Morse was "an officer of the United States" within the purview of the statute, (*U. S.* v. *Tinklepaugh,* 3 Blatchf. 428,) and that a commissioner of this court might, in a proper case, issue "legal process," within the meaning of the latter clause of said section 5398, (*U. S.* v. *Lukins,* 3 Wash. C. C. 337,) even if it should be held that he is not a "court of the United States" within the meaning thereof. And for the purpose of this case, since the decision on the demurrer, it must be assumed that Commissioner Page had jurisdiction and authority to issue any process, or make any order for the arrest, examination, and commitment of said Indians for trial in this court upon the charge of having killed a white man upon the Indian reservation. Such was the decision of the court upon the demurrer to the information; and, upon a consultation with the circuit judge at the beginning of the April term of the circuit court, he concurred in the conclusion, having already made the same ruling in effect. *U. S.* v. *Leathers,* 6 Sawy. 17; *U. S.* v. *Sturgeon,* Id. 29.

In the case of Ah Hote and Weet Soot it is alleged that the defendant took and rescued them from the custody of McDonald, and the special verdict finds, in effect, that he took them from the jail and custody of the latter without his consent,—the fact being that McDonald was made to understand that it would be no use for him to resist the defendant, and best for him not to do so. By this act the defendant certainly obstructed McDonald in the execution of the commitments from the commissioner, directing him to keep those two Indians in his custody until discharged therefrom by due course of law—that is, the law of the United States. McDonald, while Ah Hote and Weet Soot were in his custody under these commitments, was so far "an officer of the United States" within the meaning of this statute. By the resolution of September 23, 1789, congress recommended to the legislatures of the several states "to pass laws making it expressly the duty of the keepers of their jails to receive and safe keep therein all prisoners committed under the authority of the United States, until they shall be discharged by the due course

of the laws thereof, under the like penalties as in the case of persons committed under the authority of such states respectively." By section 987 of the Code of Criminal Procedure, this state, in pursuance of this resolution, gave the United States the use of its jails, and in section 988 provided that "a sheriff or jailer to whose custody a prisoner is committed, as provided in the last section, [987,] is answerable for his safe-keeping, in the courts of the United States, according to the laws thereof."

In *Randolph* v. *Donaldson*, 9 Cranch, 85, which was an action against the marshal for an escape of a debtor committed by him under said resolution to a Virginia jail, with the consent of the state, the question arose as to the custody of the prisoner under such commitment. The court held that the jailer was not the deputy of the marshal, and that the latter had nothing to do with the prisoner while in the custody of the former. In delivering the opinion of the court Mr. Justice STORY said:

" When a prisoner is regularly committed to a state jail by the marshal, he is no longer in the custody of the marshal, nor controllable by him. The marshal has no authority to command or direct the keeper in respect to the nature of the imprisonment. The keeper becomes responsible for his own acts, and may expose himself by misconduct to the 'pains and penalties' of the law. For certain purposes and to certain intents the state jail, lawfully used by the United States, may be deemed to be the jail of the United States, and that keeper to be the keeper of the United States."

As to the case of Petenus and Capsula, it is found by the special verdict that the defendant refused to deliver them to Morse when demanded by the latter in pursuance of the order of the commissioner, on account, as he said, of the state warrant which he had in the mean time received for their arrest to answer the indictment then found in the state court against them.

The defendant was then in the situation of an officer receiving different and independent writs against the same person or thing. In such case, assuming that each is lawful, it is the duty of the officer to execute them according to the priority of right, which ordinarily depends upon the time of their receipt by him. Freeman, Ex. §§ 129–135, 251. On this occasion the defendant held Petenus and Capsula upon United States process, as a United States officer or jailer, and the process from the state court was directed to him as a sheriff or state officer. Apart from any question of the paramount authority of one of these processes, arising from the exclusive jurisdiction of the United States over the subject-matter, it is plain that the state process was under the circumstances subordinated and postponed to that of the United States, and could not be executed until the latter was *functus officio*. The United States process was received by the defendant, and he was holding the prisoners under it, before the state process was even issued, or the indictment found upon which it was based. When he received the state process the Indians were *in cus-*

*todia legis,* under the United States process, and the defendant could not execute the former, or even attempt to do so, without obstructing the execution of the latter and thereby committing a crime against the United States, as well as a contempt of the authority of the commissioner. The order of the commissioner to Morse, directing him to bring the prisoners before him for further examination, was also an order to the defendant, in his character as United States jailer, to deliver Petenus and Capsula to the deputy marshal for that purpose.

The only objection now made to the validity of the commitments giving the custody of Ah Hote and Weet Soot to McDonald, and the order to the defendant to deliver Petenus and Capsula to the deputy marshal, is that it does not appear from such commitments or order, or the prior proceedings before the commissioner, that Mulheren was a white man. It is not pretended but that the defendant knew that Mulheren was a white man, and that the homicide occurred on the reservation; in other words, that as a matter of fact he knew, when he obstructed the process and disobeyed the order, of the existence of every fact that gave the commissioner jurisdiction and authority over the case, and that, notwithstanding such knowledge, he willfully obstructed the officer in the execution of such process, and resisted such order.

The order to bring up Petenus and Capsula was, so far as appears, a verbal one, and in this respect may be presumed to have followed the commitments. Whether such an order must not be in writing before it can be resisted, within the meaning of the statute, is a question. Section 1030 of the Revised Statutes is cited as showing that no "writ" is necessary to bring a prisoner into "court" or remand him to custody, "but the same shall be done on the order of the court or district attorney." It may be the practice under this section in the circuit and district courts to bring in and remand a prisoner on the verbal order of the district attorney. But if the jailer should insist on written evidence of the order of such officer to let a prisoner be taken out of his custody, it is not apparent on what ground he could be charged with resistance thereto. But this section does not appear to be applicable to a proceeding before a commissioner. Section 1014 of the Revised Statutes is the authority under which a commissioner of the circuit court acts when engaged in a proceeding for the arrest, commitment, or bail of a person charged with a crime against the United States, and such section provides that he shall proceed therein "agreeably to the usual mode of process" against offenders in such state.

A commissioner acting under this statute is simply a committing magistrate. The ambiguous phrase "mode of process" is interpreted to mean "mode of proceeding," and this proceeding is according to the law of the state in similar cases. *U. S.* v. *Rundlett,* 2 Curt. 42; *In re Martin,* 5 Blatchf. 307; *U. S.* v. *Case,* 8 Blatchf. 250.

The validity of the process and order in question must, then, be determined by reference to the law of Oregon for the arrest, examination, and commitment of persons charged with the commission of crime against the laws of the state. The statute law of the state upon the subject is found in chapters 33, 34, 35, and 36 of the Code of Criminal Procedure, (Or. Laws, 385, 393.)

Briefly stated, this requires that a warrant for the arrest of any one shall not issue except upon a statement on oath to the effect that the person sought to be arrested is guilty of some "designated crime." The warrant for the arrest must "state a crime in respect to which the magistrate has authority to issue a warrant." When arrested the accused may give bail to answer, but if he does not he must be taken before a magistrate for examination, which proceeding may be adjourned from day to day for not more than six days without the consent of the defendant, in which case the accused may be committed for examination or discharged on bail•pending the same.

The commitment for an examination may be made by an indorsement to that effect on the warrant. If the accused is held to answer, the magistrate must make an order in his docket to that effect, "designating" therein "generally" the crime for which he is held, and then make and sign a commitment, "designating" also therein, "generally," the "charge," and deliver the same with the prisoner to the sheriff, who must receive the former into his "custody and detain him until legally discharged.".

The temporary commitments in this case were not made by indorsements on the warrants, but by separate writs. But this is only a matter of form, of which the defendant cannot complain. The crime or charge against each prisoner was designated in the commitments generally as "murder." This is the name of the crime which results from the unlawful killing of a human being with malice aforethought, both at common law and in the statute. 4 Black, 195; sections 2145, 2146, 5339, Rev. St. This designation of the crime would be sufficient in a final commitment by a magistrate in a state case, when the prisoner was charged with a felonious homicide. The particulars constituting a crime are not to be stated in a commitment as in an indictment. If the cause of the commitment or species of crime charged against the prisoner be stated in the commitment with convenient certainty, that is sufficient. 4 Black, 300; Bouv. Law Dict. "Commitment;" Ex parte Burford, 3 Cranch, 448. And if the offense charged has a specific name, by which it is known in the law, as larceny, arson, burglary, or murder, a designation of it by that name in the commitment is sufficiently certain. Upon a habeas corpus to inquire into the validity of the commitment nothing more would be required on this point.

Does the fact that the commission of the crime in this case involved the circumstance that the person killed was "white," make it necessary to state the same in the commitment? I think not. What-

ever killing the law makes murder is murder and nothing more, and is sufficiently designated by the use of that term in a commitment for trial or further hearing. A commissioner of this court has authority, under the laws of the United States and upon proof of probable cause, to commit persons for trial on the charge of murder, either committed on the high seas, in Alaska, in a place in the state within the exclusive jurisdiction of the United States, or, in certain cases, upon an Indian reservation, within the state. But when he does commit a person upon such a charge it is not necessary, either under the Code or at common law, to set forth the evidence or circumstances that in the particular case constitute the crime, or demonstrate the jurisdiction of the officer beyond a peradventure. Under the law of the state (Code Crim. Proc. § 506) a person who kills another in the attempt to commit any or certain felonies, although such killing is accidental, is guilty of murder. But, in a commitment in such case, it would only be necessary to designate the crime as "murder," without mentioning the circumstance which alone made a homicide, otherwise innocent, amount to murder.

These commitments, then, are valid upon their face, and are *prima facie* legal process. Therefore, when the defendant obstructed the execution of the two directed to McDonald by taking Ah Hote and Weet Soot out of his custody, he was guilty of a violation of section 5398 of the Revised Statutes, unless it should turn out that they were void for want of authority or jurisdiction in the commissioner who executed them. But, in the judgment of this court, he had such authority and jurisdiction, and in this respect they are legal process of the United States.

The defendant, with a full knowledge of all the facts, willfully interfered with the execution of this process, and but for the considerate conduct of McDonald might have caused an unseemly and serious conflict between the national and state courts. For this misconduct he had not even the excuse that the state had by its diligence first discovered the criminals, and acquired or attempted to acquire jurisdiction in the premises.

As to the verbal order to the defendant to deliver Petenus and Capsula to the deputy marshal, the case in its legal aspect is not so clear. He is charged in the information with obstructing the deputy in the execution of these orders. But he was then claiming to hold the prisoners as sheriff under the state process, so that, in fact and law, he obstructed the execution of the commitments issued to himself as United States jailer by taking the prisoners out of his custody as such jailer upon the state process issued to himself as sheriff. But this is not the charge in the information. These commitments, being for further examination, should have been made from day to day, unless made for a definite longer period, with the consent of the prisoners. But this is an error which does not concern the defendant. It was his duty to receive and keep safely Petenus and Cap-

sula under these commitments, as a jailer of the United States, until they were discharged by the law of the United States, and, in the mean time, to return the state warrant "not executed," because the persons named therein were already in the custody of the United States upon a criminal charge.

But my impression is that the defendant was not bound to recognize a verbal order delivered to him by the deputy marshal as legal process issued by the commissioner, and that he had a right to insist upon a writing to that effect. If the commitments had been made for a day or other fixed period, there would be less difficulty in holding the verbal order sufficient, as the *mittimus* itself would in that case limit the time during which the prisoners should remain in the defendant's custody. And even then it seems to me that the jailer might demand the written evidence of the official character of such order before he could be compelled to obey it. And although the defendant did not refuse to deliver Petenus and Capsula on any such ground as this, but claimed to hold them as sheriff under the warrant of the state court, I do not think that this helps the case. If such verbal order was not legal process, no guilt was incurred by the refusal to obey it, whatever the reason may have been for such refusal.

The judgment of the court upon the special verdict is that the defendant is guilty as charged in the first count of the information, and not guilty as charged in the second one. Notwithstanding the admission in the verdict that the defendant acted in good faith, the case is one meet for exemplary punishment. But consideration will be given to the fact that the defendant, as soon as the decision on the demurrer to the information was announced, quietly surrendered the prisoners to the deputy marshal, when they were duly committed for trial in this court. The judgment of the court is that the defendant pay a fine of $100 and be imprisoned one day, and stand committed until the fine is paid.